# United States Court of Appeals

## For the First Circuit

No. 01-2083

MARIA DEL CARMEN GUADALUPE, EFRAIN LABOY GUADALUPE, MARCELINA
FRANQUI FIGUEROA,

Plaintiffs, Appellants,

v.

DR. SAMUEL NEGRON AGOSTO; HOSPITAL INTERAMERICANO DE MEDICINA
AVANZADA, INC.-HUMACAO,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,

Coffin, Senior Circuit Judge

Kevin G. Little, with whom Law Offices of David Efron was on
brief for appellants.
Fernando Agrait Betancourt for appellees.

August 7, 2002

**LIPEZ**, **Circuit Judge**.  This case concerns the grounds for establishing the liability of a hospital under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.  EMTALA requires hospitals to provide emergency room patients with an appropriate medical screening designed to identify emergency conditions.  Contending that Hospital Interamericano de Medicina Avanzada, Inc.-Humacao (HIMA) provided such a minimal screening for Narciso Figueroa that it could not be deemed appropriate, the plaintiffs appeal the district court's grant of summary judgment to HIMA.  We affirm.

## I.  Background

In reviewing an award of summary judgment, we "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  We state the facts accordingly.

On October 2, 1998, at approximately 9:50 P.M., Maria del Carmen Guadalupe took her husband, Narciso Figueroa, to the Yabucoa Diagnostic and Treatment Center (YDTC).  Figueroa was suffering from urinary retention, edema in his legs, high blood pressure, and pain.  The YDTC referred Figueroa to HIMA, where he arrived at 1:05 A.M. on October 3, 1998, accompanied by del Carmen Guadalupe.  By this time, Figueroa was also suffering from increased respiratory difficulty, a dry cough, fever, and drowsiness.

When he arrived at HIMA, Figueroa was joined by his niece, a nurse who worked at the hospital (but was off duty at the time).

She spoke to the doctor on call, Dr. Samuel Negron Agosto. While del Carmen Guadalupe filled out paperwork at the front desk of the hospital, Dr. Negron Agosto examined Figueroa. Atlhough there were other patients in the emergency room, Figueroa was examined before them. At least two nurses also attended to Figueroa, taking his vital signs, drawing blood, and arranging for an x-ray of his chest. The nurses also checked the Foley catheter (designed to drain urine) that had been attached to Figueroa before he arrived. Figueroa was conscious the whole time, communicating to family members and health care workers.

After reviewing an x-ray, Dr. Negron Agosto diagnosed Figueroa with bronchial pneumonia. In her deposition, del Carmen Guadalupe claimed that Dr. Negron Agosto told Figueroa's niece (the nurse) that Figueroa could be discharged because "nobody dies from [bronchial pneumonia]." Before del Carmen Guadalupe left with Figueroa, Dr. Negron Agosto gave her some medicine and told her to give it to Figueroa once they got home and to return to the hospital the next day to pick up the x-ray. Figueroa was discharged at about 3:00 A.M., and del Carmen Guadalupe drove him back home by 5:00 A.M. He was conscious and speaking during the journey, and did not complain about his treatment at the hospital.

After del Carmen Guadalupe and Figueroa returned to their home, they looked for the medicine, but could not find it. Rather than returning for a replacement, they decided to rest. Unfortunately, Figueroa's condition continued to deteriorate, prompting del Carmen Guadalupe to take him to another hospital,

-3-

Ryder Memorial Hospital.  Figueroa was pronounced dead upon arrival at Ryder at 1:45 P.M.  Dr. Yocasta Brugal of the Forensic Sciences Institute of Puerto Rico performed an autopsy on Figueroa and established the cause of death as bilateral bronchial pneumonia.

Plaintiffs, heirs of Figueroa, filed a complaint against HIMA and Dr. Samuel Negron Agosto on September 22, 1999, charging them with violations of EMTALA and medical malpractice under Puerto Rican law.  After discovery, HIMA filed a motion for summary judgment and/or to dismiss, arguing that the plaintiffs failed to state a claim under EMTALA.  HIMA argued that summary judgment was appropriate because undisputed facts demonstrated that the hospital had given Figueroa an appropriate screening examination comparable to the screening it would have given any patient with substantially similar symptoms.  It also moved the district court to dismiss without prejudice the malpractice claims.

To oppose the summary judgment motion, the plaintiffs submitted hospital reports, records, and policies, a deposition from del Carmen Guadalupe, and a letter and deposition from their expert, Dr. David R. Nateman, Medical Director of the Emergency Services Department of the Baptist Hospital of Miami.  Dr. Nateman's report concluded that both the Hospital and Dr. Negron Agosto

> fell below the standards of medical care for failing to diagnose a life-threatening medical condition which resulted in the death of Narcisco [sic] Figueroa.  In addition, by providing an inadequate medical screening at [the hospital], the patient was not afforded the right of determination of medical stability and therefore was illegally transferred which resulted in a violation of EMTALA.

On June 22, 2001, the district court granted HIMA's motion for summary judgment with respect to the plaintiffs' EMTALA claim, and dismissed without prejudice their supplemental malpractice claims. The plaintiffs appeal from this decision.

## II. EMTALA Standards

The parties agree that HIMA provided Figueroa with a screening; they disagree over whether it was an "appropriate medical screening" under the terms of EMTALA. 42 U.S.C. § 1395dd(a). HIMA argues that a plaintiff can prevail under EMTALA only if she can demonstrate that the hospital offered no screening at all, or deviated from its standard screening procedures applicable to other patients with similar conditions.[1] As HIMA puts it in its brief, "[w]hat EMTALA prohibits is disparate screening or no screening at all." Although appellants agree with the disparate screening standard, they also contend that a hospital can violate EMTALA if its screening is so cursory or inadequate that it is tantamount to no medical screening. As we explain, neither party has it exactly right.

---

[1] For the sake of convenience, in the remainder of this opinion we will refer to HIMA as the only defendant in this case. As a physician, Dr. Negron Agosto may be immune from EMTALA liability. While we have "not decided the issue whether EMTALA provides a cause of action against individual physicians, all circuits that have done so have found that it does not." Lebron v. Ashford Presbyterian Cmty. Hosp., 995 F. Supp. 241, 244 (D.P.R. 1998) (citing Eberhardt v. City of Los Angeles, 62 F.3d 1253 (9th Cir. 1995); King v. Ahrens, 16 F.3d 265 (8th Cir. 1994); Delaney v. Cade, 986 F.2d 387 (10th Cir. 1993); Baber v. Hosp. Corp. of America, 977 F.2d 872 (4th Cir. 1992); Gatewood v. Washington Healthcare Corp., 933 F.2d 1037 (D.C.Cir. 1991)). Since we decide that EMTALA was not violated here, we need not decide the question of physician liability in this case.

By its terms, EMTALA is designed to assure that any person visiting a covered hospital's emergency room is screened for an emergency medical condition and is stabilized if such a condition exists.[2] With respect to screening, it requires the following:

> In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. § 1395dd(a). EMTALA does not define the term "appropriate medical screening examination." However, it does indicate that the purpose of the screening is to identify an "emergency medical condition." An emergency medical condition is defined as

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in--
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A). To identify such conditions, hospitals are expected to employ "ancillary services routinely available to the emergency department." 42 U.S.C. § 1395dd(a).

---

[2] A covered hospital is defined as a "hospital that has entered into a provider agreement under section 1395cc of this title." 42 U.S.C. § 1395dd(e)(2). Both sides agree that HIMA is covered by EMTALA.

However, they are not liable for failing to conduct examinations (or parts thereof) that are not "within the capability of the hospital's emergency department."  42 U.S.C. § 1395dd(a).

With the statutory language as a guide, we have said previously that "[t]he essence of [EMTALA's] screening requirement is that there be some screening procedure, and that it be administered even-handedly."  Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995).  Thus, there is both a substantive and a procedural component to an appropriate medical screening under EMTALA: "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints."  Id.; see also Jackson v. East Bay Hosp., 246 F.3d 1248, 1256 (9th Cir. 2001) ("We hold that a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" (quoting Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1257 (9th Cir. 1995))).

# III. Applying the Legal Standards

## A. Reasonably Calculated to Identify Critical Medical Conditions

In pressing their claim that HIMA failed to provide Figueroa with an appropriate medical screening under the terms of EMTALA, plaintiffs argued that "[t]he medical examination and treatment [offered to Figueroa] . . . was totally inadequate and inappropriate for a man in his condition." In moving for summary judgment in response to this claim, HIMA focused on concessions elicited from the plaintiffs' expert witness, Dr. Nateman, during his deposition. Although Dr. Nateman concluded that there had been an "improper screening," he also conceded that he could not be certain whether Figueroa suffered from a "life-threatening condition" when he arrived at HIMA. Dr. Nateman also admitted that Figueroa was treated rapidly at the hospital, noting that Figueroa "was triaged, [had] some vital signs done, had a physical exam by the doctor, and chest x-rays [and] laboratory tests were ordered."

Figueroa's wife, del Carmen Guadalupe, confirmed this testimony in her deposition. She also testified that Figueroa was given medication at the emergency room. She stated that, at the close of their visit, she was given a prescription and told to come back in the morning for the x-rays. Del Carmen Guadalupe also stated at the deposition that her husband did not appear to be in critical condition when he left the hospital with her:

    Q: [B]y five in the morning . . . your husband was doing well
    in the car.
    A: Yes.
    Q: That is, conscious and talking and all that.
    A: Yes.

Q. Did he express any complaints about the way he was attended in there?
A: No.
Q: Some sort of malcontent?
A: No.
Q: You personally, did you feel you were attended?
A: Yes.

Given the concessions of Dr. Nateman and del Carmen Guadalupe, HIMA argues that it was clear that HIMA's screening of Figueroa was reasonably calculated to identify critical medical conditions afflicting him.

In response, the plaintiffs argue that, while this screening examination may have been adequate for many emergency room patients, it was "totally inadequate and inappropriate for a man in [Figueroa's] condition." According to Dr. Nateman, Figueroa's co-morbid conditions--his obesity, age (51), edematous legs, catheterization, and high respiration rate--made him a "vascular nightmare waiting to happen," a man with an obvious "potential for death." Dr. Nateman concluded that an appropriate screening examination would have included, at a minimum, an electrocardiogram, a fuller assessment of Figueroa's respiratory function, and an immediate reading of the chest x-ray by a radiologist.[3] At the very least, say the plaintiffs, these

---

[3] Dr. Nateman's deposition suggests that Figueroa's chest x-rays were examined twice--once at about 2:00 A.M. (by the doctor on call), and then again at 11:05 A.M. (by a radiologist). Dr. Nateman stated that the doctor on call clearly misdiagnosed Figueroa, in part because "his chest x-rays were not normal." However, Dr. Nateman also admitted that he did not have the x-rays with him at the deposition, and therefore could not answer an attorney's question as to whether "the reading by the emergency room doctor [was] obviously wrong, or . . . [was] reasonably misread [by a non-radiologist]."

contentions created a "genuine issue of material fact" regarding the appropriateness of the screening examination offered to Figueroa.

Although plaintiffs' arguments have some force, they ignore the important distinction between an EMTALA claim and a malpractice claim. EMTALA does not "create a cause of action for medical malpractice," and "faulty screening, in a particular case . . . does not contravene the statute. " Correa, 69 F.3d at 1192-93. Dr. Nateman's criticisms of HIMA's diagnosis of Figueroa in the emergency room are indistinguishable from the standard of care criticisms that one would hear from an expert in a malpractice case triggered by a misdiagnosis. Under EMTALA the issue is not what deficiencies in the standard of emergency room care contributed to a misdiagnosis. See Gatewood, 933 F.2d at 1041 (observing that EMTALA is not intended "to ensure each emergency room patient a correct diagnosis"). Rather, the issue is whether the procedures followed in the emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify the patient's critical medical condition. Dr. Nateman's criticisms do not address this precisely formulated EMTALA standard.

Moreover, whereas malpractice liability usually attaches when a health care provider fails to adhere to a "general professional standard" of care, W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 32, at 188 (1984), EMTALA only requires "an appropriate medical screening examination within the capability of

-10-

the hospital's emergency department."  42 U.S.C. § 1395dd(a).  As the Fourth Circuit has observed:

> This section establishes a standard which will of necessity be individualized for each hospital, since hospital emergency departments have varying capabilities. Had Congress intended to require hospitals to provide a screening examination which comported with generally accepted medical standards, it could have clearly specified a national standard.  Nor do we believe Congress intended to create a negligence standard based on each hospital's capability. EMTALA is no substitute for state law medical malpractice actions.

Baber, 977 F.2d at 879-80.  Although Dr. Nateman criticized HIMA for failing to perform certain tests for Figueroa, plaintiffs offered no evidence indicating that such tests were within HIMA's capability.  For example, Dr. Nateman stated during his deposition that, at his hospital, he would test "oxygen saturation [for] anybody who comes in with any kind of respiratory complaints." However, he also admitted that he did not know "if [HIMA has] the machine necessary for such a test."  Dr. Nateman suggested that HIMA should have had a radiologist examine Figueroa's x-rays as soon as they were developed.  However, he also said that he had "no idea" whether the hospital's radiology department was in full operation at that time.  Plaintiffs offered no evidence that HIMA had an electrocardiogram machine available, or had staff on hand qualified to perform a "respiratory differential"--two other items Dr. Nateman deemed essential to an "appropriate medical screening examination."  A claim of inappropriate medical screening based on a failure to provide certain diagnostic tests must at least address whether the hospital was capable of performing such tests.  Because plaintiffs failed to present such evidence or evidence that HIMA's

screening was not "reasonably calculated to identify critical medical conditions," Correa, 69 F.3d at 1192, summary judgment for HIMA on the substantive component of EMTALA was appropriate.

## B. Disparate Treatment

The district court concluded that the plaintiffs' failure to "submit any . . . policies on the initial screening standards of Defendant HIMA" was "a fatal flaw in their case." Without that evidence, the district court concluded, the plaintiffs could not demonstrate that HIMA gave Figueroa a more cursory screening than it gave to other patients with substantially similar symptoms. Although we affirm the decision to grant summary judgment on the disparate treatment claim, we do not agree that the claim necessarily failed because the plaintiffs did not submit the screening policies of HIMA. Although they are effective for demonstrating disparate treatment, written hospital screening policies may not exist, and therefore cannot be necessary to a disparate treatment determination.[4]

Moreover, "'we may affirm [a summary judgment] order on any ground revealed by the record.'" McGurn v. Bell Microproducts, 284 F.3d 86, 91 (1st Cir. 2002) (quoting Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)).

---

[4] If evidence of such written screening policies were indispensable to EMTALA liability, a hospital could avoid liability simply by failing to generate them. A "hospital cannot simply hide behind [a] lack of standard emergency room procedures." Power v. Arlington Hosp. Assoc., 42 F.3d 851, 858 (4th Cir. 1994) (internal quotation marks omitted).

Plaintiffs failed to submit any evidence establishing that HIMA treated Figueroa any differently than it treated other patients with substantially similar symptoms. HIMA submitted an affidavit from its president, Carlos Pineiro Crespo, stating that "there were no deviations on Mr. Figueroa's case from the standard treatment HIMA offers persons in Mr. Figueroa's condition." The plaintiffs cannot contradict this assertion because they have not addressed the baseline level of screening prevailing at HIMA. At his deposition, Dr. Nateman was asked whether "there was [sic] any deviations of the standard treatment that [HIMA] gives to people in the condition of Mr. Figueroa," and he replied "I can't comment on that. I'm not sure." The plaintiffs made no effort to compare Figueroa's screening with screenings of other HIMA patients suffering from substantially similar symptoms. By submitting no testimony regarding the baseline of care which the hospital provides, the plaintiffs failed to raise a genuine question of material fact on the issue of differential treatment.

The plaintiffs argue that the hospital may not have revealed its screening procedures during discovery, and that subsequent fact-finding might reveal this crucial evidence. They claim that "[w]hen Defendants control the information, in essence controlling the keys to the dismissal, the dismissal should not be granted," Ortiz v. Mennonite Gen. Hosp., 106 F. Supp. 2d 327, 331 (D.P.R. 2000). However, in Ortiz, the hospital clearly gave evasive answers to interrogatories--something the plaintiffs here do not allege. Id. Moreover, while they now imply that HIMA may be

-13-

concealing the relevant documents, the plaintiffs assured the district court on October 27, 2000, that "Defendant HIMA-Humacao has answered all discovery submitted by the plaintiffs." Given their failure to press for the relevant documentation at that time, they cannot now claim that the mere allegation of disparate treatment raises a genuine issue of material fact over whether disparate treatment actually occurred. "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists [or] 'promise[s] to produce admissible evidence at trial.'" Griggs, 904 F.2d at 115 (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 49 (1st Cir. 1990)).

## IV. Stabilization

In addition to a medical screening requirement, EMTALA mandates that hospitals stabilize patients with emergency medical conditions before releasing them. See 42 U.S.C. § 1395dd(b) (requiring "stabilizing treatment for emergency medical conditions and labor"). In a footnote at the conclusion of their brief, the plaintiffs claim that, although they charged HIMA with violating the stabilization requirement in their complaint, "the district court did not address [whether HIMA complied with] EMTALA's stabilization requirement." However, the district court did explain why the stabilization requirement does not apply to this case: "If no emergency condition is detected, there is no duty to stabilize." The district court's inquiry properly ended after it determined that Figueroa's screening was neither inadequate nor inequitable, and that the screening revealed no emergency

-14-

condition.   A hospital is only "required to stabilize" an individual if "the hospital determines that the individual has an emergency medical condition."   42 U.S.C. § 1395dd(b)(1).   The district court correctly applied the statute to this case.

## V.  Conclusion

For the foregoing reasons, the decision of the district court is **<u>affirmed</u>**.   Each side shall bear its own costs.