Candida **DOMINGUEZ–PEREZ Juan, Jose Luis and Margarita Ortiz–Dominguez, per se and as heirs of Juan Ortiz–Batista Plaintiffs**

v.

**HOSPITAL AUXILIO MUTUO American International Insurance Company Dr. John Doe; Dr. Richard Roe; ABC Insurance Companies Defendants**

No. CIV.01–1698CCC.

United States District Court,
D. Puerto Rico.

Feb. 28, 2003.

Lcda. Karla S. Mellado–Delgado, for Plaintiff or Petitioner.

Lic. Ricardo Ruiz–Díaz, Lic. John Ward–Llambias, for Defendant or Respondent.

## ORDER

CEREZO, District Judge.

This is an action brought by the widow and children of Mr. Juan N. Ortiz–Batista against defendants Hospital Auxilio Mutuo (Auxilio) and its insurer, American International Insurance Company of Puerto Rico, pursuant to the Emergency Medical Treatment and Active Labor Act (EMTA-LA) (42 U.S.C. § 1395dd), and Articles 1802 and 1803 of the Civil Code of Puerto Rico (31 L.P.R.A. § 5141 & 5142).[1] Before the Court now is defendants' Motion for Summary Judgment (**docket entry 31**),[2] plaintiffs' opposition (**docket entry 35**), and defendants' reply to the opposition (**docket entry 45**).

The undisputed factual scenario follows. On June 13, 1999, Mr. Ortíz–Batista, a 74 year-old man with a history of high blood pressure, prostate cancer and cardiac illnesses, was taken by some relatives to Auxilio's emergency room for treatment. Upon his arrival to the emergency room at 5:40 P.M., Mr. Ortíz–Batista complained of general weakness, lack of appetite, abdominal pain, being disoriented, and swelling of his right foot. The emergency room screener immediately took his vital signs, which were recorded as follows: temperature 35.5 degrees, pulse 68/min., blood pressure 120/66 mmhg and respiration 16/min.[3] He was then classified as a Category II patient in accordance with the Emergency Room Triage Categories established

1. In their complaint (docket entry 1), plaintiffs joined their EMTALA claim with several malpractice claims against movants and other unknown co-defendants under the Court's supplemental jurisdiction (*see* Complaint, ¶¶ 8, 27–30, docket entry 1). Said claims as to the unknown defendants were voluntarily dismissed from the action on April 25, 2002 (*see* docket entry 29).

2. Both defendants had initially filed a motion to dismiss (docket entry 19), which the Court denied as it included several exhibits extraneous to the allegations of the complaint and failed to comply with Local Rule of Procedure 311.12 (*see* docket entry 24). Upon considering defendants' request for reconsideration of the Order denying their motion to dismiss (docket entry 26), the Court agreed to convert said dismissal motion to one for summary judgment and granted defendants a final term to comply with Rule 311.12 and to supplement their original motion (*see* docket entry 28). Defendants, however, opted to file a new motion for summary judgment (docket entry 31). It is this last motion the one we now address.

3. Normal readings are: temperature between 36.5 and 37.5 degrees Celsius, pulse between 60 and 100 beats per minute, respiration between 12 and 20 breaths per minute, and blood pressure between 100/60 and 140/90 millimeters of mercury. *See* University of California, San Diego, A Practical Guide to Clinical Medicine, web site.

by Auxilio, which range from I to IV depending on the severity of the conditions exhibited by the patients when they are triaged.

At 6:15 P.M., Mr. Ortíz–Batista was examined by the emergency room attending physician, Dr. Colón–Pagán, who again noted his vital signs as follows: blood pressure 120/66 mmhg, pulse 66/min., temperature 35.5 degrees and respiration 16/min. As a result of his examination, Dr. Colón–Pagán determined to rule out anemia and blood loss as the cause of Mr. Ortíz–Batista's tribulations, and ordered that a Complete Blood Cell Count (CBC) and an emergency profile be performed, and that intravenous fluids with Mefoxin, an antibiotic, be administered. The hospital records show that the CBC and emergency profile tests were done at 9:08 P.M., that at least the results for the emergency profile test were posted at 9:49 P.M., and that the low reading for sodium (NA) it contained was reviewed and informed to a Dr. Rivera. There is no indication of when the intravenous fluids were administered, although the parties agree that this was done. *See e.g.* Complaint, docket entry 1, p. 5, ¶ 16.

The Nurses' Progress Notes, prepared at 8:30 P.M., reflect that the patient's vital signs at the time were as follows: temperature 35.5 degrees, pulse 66/min., respiration 16/min. and blood pressure 120/66 mmhg. The Notes also reveal that all his vital systems were examined at that time showing that the patient was alert and oriented in person, place and time and responded to stimulus, his lungs were clear and he was not coughing, his respiration and pulse were regular, his urine was normal, and his abdomen was normal with peristalsis present. Although the CBC and emergency profile results had some readings below, and one above, the listed reference values, at 11:30 P.M. Mr. Ortíz–Batista was discharged from Auxilio. His

vital signs had barely changed during his nearly six-hour stay, as at the time of discharge they were recorded as follows: temperature 36 degrees, pulse 60/min., respiration 18/min. and blood pressure 120/60 mmhg. The record also indicates that Mr. Ortíz–Batista expressed at the time of his discharge that he was feeling better. It further reflects that he was instructed to continue with his normal physical activities, a regular diet, and that no medications were prescribed. Auxilio never determined that Mr. Ortíz–Batista had an emergency medical condition.

On the following day, as Mr. Ortíz–Batista's condition did not improve, his relatives took him to the offices of Dr. Conrado W. Asenjo, a gastroenterologist. Dr. Asenjo then referred him to the emergency room of San Francisco Hospital in Rio Piedras, where he was evaluated and admitted due to his disorientation, low levels of sodium in his blood and what eventually evolved to weakness in the right side of his body. A CT brain scan later revealed that he had suffered a cerebral infarct. His condition continued to deteriorate and on June 24, 1999 he died while still hospitalized at San Francisco Hospital. Plaintiffs then filed this action on May 25, 2001.

In their motion for summary judgment, defendants argue that plaintiffs lack a cause of action under EMTALA for, as they see things, they complied with the statute's requirement of properly screening plaintiffs' relative in accordance with their established screening procedures and, although determining that he was not suffering from an emergency condition, of treating and releasing him in a stable condition. Defendants point out that plaintiffs have failed to allege that the screening provided to their relative was different from that provided to other patients in Auxilio's emergency room. They contend that, at most, plaintiffs' allegations of an

improper evaluation/diagnosis amount to a malpractice claim which is outside the realm of EMTALA. As an additional basis for dismissal, defendants aver that plaintiffs' complaint, filed nearly two years after their relative's death, is time barred pursuant to Article 1868(2) of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5298(2).

Plaintiffs, in turn, contend that the undisputed factual allegations contain all the essential elements to configure a viable claim under EMTALA. They portray the relevant scenario as one in which "[a]fter some six (6) hours during which the emergency medical records account for no treatment whatever (sic) the patient is discharged *supposedly* stable from the hospital's emergency room...." Opposition, docket entry 35, p. 6, ¶ 17 (emphasis in original). They insist that Auxilio must have been aware of the "array of emergency medical conditions" (*id.*, at p. 9, ¶ 25) afflicting Mr. Ortiz–Batista, but still failed to stabilize him before discharge as required by EMTALA. By the same token, they claim that "[t]he fact that Mr. Ortiz–Batista (sic) chief complaints were practically all ignored" (*id.*, at p. 10, ¶ 26) shows that Auxilio failed to provide him an appropriate medical screening as required by EMTALA. Plaintiffs refer us to their expert's report, which points out that the emergency room's medical record "fails to document a physical examination of patients (sic) three (3) out of five (5) complaints." *Id.*, at p. 12, ¶ 31. Finally, and with regard to the issue of the running of the statute of limitations, plaintiffs have submitted a certified letter mailed to Auxilio on June 13, 2000 and received by them on June 15, 2000 which they claim constituted an extrajudicial claim that tolled the statute of limitations pursuant to Article 1873 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5298(2).

■ We first address defendants' challenge to the EMTALA claim. In doing so, we deem convenient to restate the applicable principles of law that guide our analysis. It is apodictic by now that "EMTALA is a limited 'anti-dumping' statute, not a federal malpractice statute." *Reynolds v. MaineGeneral Health,* 218 F.3d 78, 83 (1st Cir.2000) (*citing Bryan v. Rectors and Visitors of the Univ. of Va.,* 95 F.3d 349, 351 (4th Cir.1996)). However, "it is clear that at a minimum Congress manifested an intent that all patients be treated fairly when they arrive in the emergency department of a participating hospital and that all patients who need some treatment will get a first response at minimum and will not simply be turned away." *Reynolds,* 218 F.3d at 83. As thoroughly explained by the Court of Appeals in *Correa v. Hospital San Francisco,* 69 F.3d 1184, 1190 (1st Cir.1995),

> EMTALA has two linchpin provisions. First, it requires that a participating hospital afford an appropriate medical screening to all persons who come to its emergency room seeking medical assistance. *See* 42 U,S.C. § 1395dd(a). Second, it requires that, if an emergency medical condition exists, the participating hospital must render the services that are necessary to stabilize the patient's condition, *see id.* § 1395dd(b)(1)(A), unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety, *see id.* § 1395dd(b)(1)(B), (c)(1).

■ What constitutes "appropriate medical screening" is not defined in the statute. The Court of Appeals observed in *Correa,* however, that "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions

that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints.... The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Correa*, 69 F.3d at 1192. The Court went on to differentiate between "a refusal to follow regular screening procedures in a particular instance," which contravenes the statute, and "faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all," which does not. *Correa*, 69 F.3d at 1192–93. In sum, under EMTALA "the issue is whether the procedures followed in the emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify the patient's critical medical condition." *del Carmen Guadalupe v. Negrón Agosto*, 299 F.3d 15, 21 (1st Cir.2002).

■ In this particular instance, the undisputed facts establish that Mr. Ortiz–Batista was triaged upon his arrival at Auxilio following the guidelines adopted by the hospital for said purposes, had his vital signs repeatedly checked, was physically examined by a doctor, had laboratory tests ordered and done, had all his vital systems reviewed by a nurse, was administered medication, and was eventually released after expressing that he was feeling better. Thus, it appears evident to us that he was submitted to a screening "reasonably calculated to identify critical medical conditions afflicting him," *del Carmen Guadalupe*, 299 F.3d at 20, as required by EMTALA. Although plaintiffs contend that he was not, the scenario which they advance in support of their claim is not supported by the record. Contrary to their representations, Mr. Ortiz–Batista was not left untreated during the almost six hours he spent at the emergency room. As we summarized above, he was examined by at least a triager, a doctor, and a nurse during his stay, and administered IV fluids.

While their expert's report indicates that "[t]here is no evidence in the medical record that upon the physical examination, patient's abdominal pain, nor general weakness were evaluated," Exhibit II to Opposition, docket entry 35, it appears, as we indicated above, that a review of all his vital systems, including the gastrointestinal, was performed by a nurse without it revealing any significant findings. Plaintiffs also put much emphasis on the absence of any indication in the medical record reflecting that the reasons for their relative's low blood sodium level were duly investigated, but the record shows that this low reading was reported to a doctor presumably so that action be taken. The fact that it was overlooked, which is all the record shows, only points to a faulty screening by Auxilio. But while this could possibly serve as a basis for a garden variety medical malpractice claim, it is simply not enough to trigger a violation of EMTALA. Thus, as we find that Mr. Ortiz–Batista's substantive screening by Auxilio complied with the requirements of EMTALA, summary judgment will be entered on plaintiffs' substantive screening claim.

■ Having disposed of plaintiffs' substantive screening claim, we turn now to evaluate whether they have stated a procedural screening claim by showing that Auxilio's screening procedure was not administered even-handedly. In this regard, the complaint only contains a conclusory allegation that Auxilio "provided the patient with substandard and disparate treatment," (Complaint, docket entry 1, p. 9). Plaintiffs, however, failed to state any facts at the pleading stage, and to present any evidence at this summary judgment stage, "establishing that [Auxilio] treated [Mr. Ortiz–Batista] any differently than it treated other patients with substantially similar symptoms." *del Carmen Guadalupe*, 299

F.3d at 22. Thus, summary judgment is also appropriate on plaintiffs' procedural screening claim under EMTALA. Plaintiffs having failed to establish a claim under either EMTALA's substantive or procedural screening components, their claim premised on Auxilio's failure to provide their relative with an "appropriate medical screening" under § 1395dd(a) of EMTALA is DISMISSED.

■ Finally, we address plaintiffs' claim for failure to stabilize under § 1395dd(b) of EMTALA. Having concluded that Ortiz-Batista's screening was neither inadequate nor inequitable, and Auxilio having determined pursuant to that screening that the patient was not suffering from an emergency medical condition, no duty to stabilize ensued under the statute. *del Carmen Guadalupe*, 299 F.3d at 23. Plaintiffs plainly failed to "proffer evidence sufficient to support a finding, reasoned from evidence, that an emergency medical condition, within the meaning of the statute, was already in existence at the time of Mr. [Ortiz-Batista's] discharge." *Reynolds*, 218 F.3d at 85. Hence, summary judgment is also warranted on the stabilization claim brought under § 1395dd(b) of EMTALA.

As there is no surviving claim under EMTALA, which served as the federal jurisdictional anchor to plaintiffs' supplemental malpractice claim, we decline to exercise jurisdiction over said claim. Thus, we need not address defendants' additional argument that the complaint is time barred. Accordingly, defendants' motion to dismiss (**docket entry 31**) is GRANTED as to the claims brought under EMTALA. Judgment will be entered by separate order DISMISSING plaintiffs' EMTALA claims, and DISMISSING without prejudice their supplemental claims.

SO ORDERED.

**JUDGMENT**

For the reasons stated in our Order of this same date plaintiffs' claims brought under the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, are hereby DISMISSED, with prejudice.

Plaintiffs' supplemental claims are also DISMISSED, without prejudice.

SO ORDERED AND ADJUDGED.