William ROA GIL, et.al., Plaintiffs,

v.

Hospital Dr. Alejandro OTERO LOPEZ, et.al. Defendants.

No. CIV. 00–1727(PG).

United States District Court,
D. Puerto Rico.

July 21, 2003.

---

Domingo Emanuelli–Hernandez, Arecibo, PR, Pablo Cabrera–Vargas, Casselberry, FL, for William Roa–Gil, Frances Vidal–Rodriguez, Natalia Roa–Vidal, minor, plaintiffs.

Adaljisa Perez–Andreu, San Juan, PR, Miguel G. Laffitte, Delgado & Fernandez, San Juan, PR, for Hospital Dr. Alejandro Otero Lopez (Manati Area Hospital), Pavia Health, Inc., John Doe 00CV1727, persons or entity who owns or operates the pediatrics room in Hospital Alejandro Otero Lopez, A–Z Ins. Co., defendants.

## *OPINION AND ORDER*

PEREZ–GIMENEZ, District Judge.

Before the Court is Magistrate Judge Gustavo Gelpí's unopposed Report and Recommendation (Docket No. 34). For the reasons set forth below, the Court **ADOPTS AND APPROVES** the Magistrate's Report and Recommendation, and hereby **GRANTS** Defendant's Motion for Summary Judgment (Docket No. 31).

### *Factual Background*

On July 12, 1999, Plaintiffs Frances Rodríguez Vidal and William Roa Gil took their eight-month old daughter, Natalia Roa Vidal, to Dr. Alejandro Otero López Hospital's emergency room, complaining that the infant had been vomiting and suffering from rectal bleeding. (Pls.' Uncontested Facts # 3 and 5) (Docket No. 31). At 6:05pm on July 12, 1999, the child was "triaged" and evaluated by a nurse, who measured her weight, pulse, respiratory rate, and temperature, and noted her principal complaints. (Pls.' Uncontested

Facts, # 4 and 5). The child was then evaluated by Dr. Flores, who, pursuant to a physical examination, ordered several tests and admitted Natalia to remain under observation with an initial diagnosis of gastritis. (Pls.' Uncontested Facts, # 7). Subsequently, Dr. Flores ordered additional blood tests and the administration of certain medications. (Pls.' Uncontested Facts, # 8).

Early in the morning of July 13, 1999, after Dr. Flores had finished his shift, the infant was re-evaluated by pediatrician Dr. María Vázquez, who performed a rectal exam on the child and, noting symptoms "compatible with internal fissure", ordered additional tests and admitted her to the Hospital's pediatric ward. (Pls.' Uncontested Facts, # 9 and 11). Among the tests ordered by Dr. Vázquez were x-rays that revealed "changes consistent with obstruction". (Pls.' Uncontested Facts, # 12). Dr. Vázquez then consulted with surgeon Dr. Figueroa who, after the pertinent evaluation, suggested that the child might be afflicted with intussusception, and scheduled and ultimately performed a surgical procedure that consisted of a "reduction of the intussusception with a right hemicolectomy". (Pls.' Uncontested Facts, # 13). The child was subsequently discharged from the Hospital on July 19, 1999. (Pls.' Uncontested Facts, # 17).

### The Magistrate Judge's Report and Recommendation

Magistrate Judge Gustavo Gelpí issued a "Report and Recommendation" on April 2, 2003 in which he recommended that Defendant's Motion for Summary Judgment be granted. The Magistrate based this recommendation on his conclusion that "plaintiffs' claims in the present action fail to meet the applicable standards for a cause of action under the Emergency Medical Treatment and Active Labor Act" (EMTALA), 42 U.S.C. § 1395dd, and on the absence of any issue of material fact

that would mandate a trial. Citing, *inter alia*, the recent First Circuit pronouncement in *Guadalupe v. Negron Agosto*, 299 F.3d 15 (1st Cir.2002), the Magistrate Judge correctly noted that Plaintiffs' claims "are more akin to a medical malpractice action", and, thus, are beyond EMTALA's purview.

### Summary Judgment Standard

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir.2000). Material facts are those that are outcome-determinative under the governing substantive law. *Morrissey v. Boston Five Cents Savings Bank*, 54 F.3d 27, 31 (1st Cir.1995). To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1 st Cir.1997), through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *Suarez v. Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment juncture, there is "no room for the measured weigh-

ing of conflicting evidence", or for the injection of the judge's own conceptions of likelihood into the determination. *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987). The Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. *See Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). Nonetheless, when evaluating the evidence before it, the Court may safely ignore "conclusory allegations, improbable inferences and unsupported speculation." *Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000).

### Discussion

■ In the late 1980's, faced with hiking health-care costs, Congress became concerned "about the increasing number of reports that hospital emergency rooms [were] refusing to accept or treat patients with emergency conditions if the patient [did] not have medical insurance." H.R.Rep. No. 241(I), 99th Cong., 1st Sess.27 (1986), reprinted in U.S.C.C.A.N. 42, 605. The Legislature abated this concern by enacting EMTALA to "assure that any person visiting a covered hospital's emergency room is screened for an emergency medical condition and is stabilized if such a condition exists." *Guadalupe*, 299 F.3d at 19. With respect to screening, the Act requires the following:

> In the case of a hospital that has a hospital emergency department, if any individual...comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or

not an emergency medical condition...exists.

42 U.S.C. § 1395dd(a). Though the statute fails to define "appropriate medical screening examination", it is firmly established that the essence of EMTALA's screening requirement "is that there be some screening procedure, and that it be administered even-handedly." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir.1995).

■ With the statutory language and legislative intent as guiding beacons, the First Circuit has held that "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Id.* As the Magistrate Judge correctly pointed out, Courts have unequivocally held that "EMTALA does not create a cause of action for malpractice." *Guadalupe*, 299 F.3d at 21 (internal quotations omitted). Thus, "a refusal to follow regular screening procedures in a particular instance contravenes the statute, but **faulty screening, in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute.**" *Correa*, 69 F.3d at 1192–93 (internal citations omitted) (emphasis supplied). To recover for disparate treatment, the plaintiff must proffer evidence "sufficient to support a finding that [he or she] received materially different screening than that provided to others in his [or her] condition. It is not enough to proffer expert testimony as to what treatment should have been provided to a patient in [Plaintiff's] position." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 84 (1st Cir.2000). The critical threshold question in this case is not whether Natalia Roa Vidal received faulty or deficient screening at Hospital Dr. Ale-

jandro Otero López, but whether the hospital had in place a screening procedure reasonably calculated to identify an emergency condition, and whether the infant was submitted to that procedure in the same way that other similarly situated patients customarily were.

Much like the Plaintiffs in *Guadalupe*, the Plaintiffs in the case at bar base their cause of action on their contention that Hospital Dr. Alejandro Otero López provided such deficient screening for Natalia Roa Vidal that it could not be deemed appropriate under EMTALA. Specifically, Plaintiffs allege that Dr. Flores' delay in consulting with a pediatrician and/or pediatric surgeon, and his failure to order x-rays deviated to such an extent from the Hospital's protocol as to render the screening virtually non-existent. (Pls.' Opp'n to Summ. J., Docket No. 32, at 8). As did the Court of Appeals in *Guadalupe*, this Court disagrees with Plaintiffs' importunements.

As noted by the Magistrate Judge, the Hospital's "Norms and Procedures Regarding the Consultation of Specialist Physicians" (Docket No. 31, Exhibit 20) state that emergency room doctors have a consultation mechanism at their disposal. The decision to utilize the consultation mechanism, however, is not mandated by the Hospital's screening protocol, but made available for the individual physician's discretionary use. Likewise, the Hospital's "Interdepartmental Relationship of the Emergency Department with Other Departments in the Hospital" (Docket No. 32, Exhibit 12) in no way imparts a duty on an emergency room physician to order x-rays or otherwise rely on other departments, but merely lists all the resources available to the physicians if they chose to use them. Like the specialist consultation mechanism, only the individual physician's medical judgment dictates what departments, if any, he or she should use and consult when treating a patient.

Plaintiffs' allegations regarding Dr. Flores' delay in consulting with either a pediatrician or a pediatric surgeon, and his delay in ordering x-rays, have the distinct sound of a medical malpractice claim. Given the discretionary nature of the specialist consultation mechanism and the interdepartmental relationship protocol, Plaintiffs' allegations address the propriety and competency of Dr. Flores' treatment and medical judgment and in no way amount to a cognizable claim under EMTALA.[1] *See Correa*, 69 F.3d at 1192–93. Plaintiffs in no way claim or proffer evidence to suggest that the Hospital treated Natalia Roa Vidal any differently than it did other patients with substantially similar symptoms, and thus have failed to prove disparate treatment. *See Reynolds*, 218 F.3d at 84. Whether the decisions of the individual physicians involved in this unfortunate incident were erroneous, or even negligent, is beyond the realm of EMTALA and more in the province of medical malpractice. Plaintiffs' claims are thus incongruous with the Act, and should be dismissed. *See Correa*, 69 F.3d at 1192–93.

Unlike the Magistrate Judge, the Court believes it unnecessary to reach the issue of Natalia's parents' standing under EMTALA. As such, the entire controversy can be, and is disposed of on these grounds. The Court refrains from intimating any opinion on the issue of a parent's standing to sue for pain and suffering damages under the EMTALA.[2]

1. The Court in no way intimates whether a malpractice claim against Defendants would in fact be successful. We need only address the merits of plaintiffs' allegations in the context of EMTALA.

2. Though the Court is making no determina-

### Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**, and Plaintiffs' claims under EMTALA are **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

tion on the matter, even assuming the parents' claims for pain and suffering sound in negligence under Puerto Rico law, 31 L.P.R.A. § 5141, the Court would decline to exercise supplemental jurisdiction over them.

*See* 28 U.S.C. § 1367(c)(3) ("The district court may decline to exercise supplemental jurisdiction...if the district court has dismissed all claims over which it has original jurisdiction").