**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 24-1522
_____

NORMAN SHAW, JR.,
                              Appellant

v.

WAYNE MEMORIAL HOSPITAL
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3:20-cv-01594)
Magistrate Judge:  Honorable Susan E. Schwab

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 4, 2025
Before:  BIBAS, FREEMAN, and NYGAARD, <u>Circuit Judges</u>

(Opinion filed: March 13, 2025)
_____

OPINION[*]
_____

PER CURIAM

        Pro se appellant Norman Shaw appeals from the District Court's judgment in favor

of Wayne Memorial Hospital. We will affirm.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

I.

On November 26, 2019, while Shaw was incarcerated at a federal prison in Waymart, Pennsylvania, another prisoner bit his left pinky finger. Shaw was brought to Wayne Memorial Hospital's emergency room. At the emergency room, Dr. Sorini allegedly informed Shaw that his hand could not be x-rayed because the x-ray machine was broken. It's undisputed that emergency room staff cleaned, sterilized, bandaged, and splinted Shaw's finger, and gave him a tetanus shot. Shaw was discharged back to the prison, and prison medical personnel prescribed him antibiotics. On January 7, 2020, Shaw's hand was x-rayed, revealing a fracture on the bitten finger. On January 16, 2020, Shaw saw a hand specialist, who applied a splint and recommended future surgical intervention based on his x-ray results. Shaw asserts that surgery was scheduled for February 6, 2020, but he was transferred from the prison three days before the surgery.

Shaw sued the hospital, alleging violations of the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd.[1] He demanded $20 million for his pain and suffering, noting the "deteriorating condition" of his finger and his "deformed permanent disability." See ECF No. 1 at 12. The District Court[2] denied the

---

[1] We do not address Shaw's vaguely asserted medical negligence or gross negligence claim, because his appellate briefs do not address it.

[2] Here, the District Court refers to a Magistrate Judge acting with the parties' consent, pursuant to 28 U.S.C. § 636(c).

2

hospital's motion to dismiss but ultimately granted its motion for summary judgment. Shaw timely appealed.

## II.

We have jurisdiction under 28 U.S.C. § 1291 over a district court's grant of summary judgment, and our review is plenary. See Anglemeyer v. Ammons, 92 F.4th 184, 188 (3d Cir. 2024). Summary judgment is appropriate only if the moving party shows that there is no genuine dispute as to any material fact and that that party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We may affirm the District Court's judgment on any basis supported by the record. See Hildebrand v. Allegheny County, 757 F.3d 99, 104 (3d Cir. 2014).

## III.

Shaw's opening brief tersely asserts that the District Court erred in granting the hospital's summary judgment motion. Considering the minimal record that Shaw provided at summary judgment, we are satisfied that the District Court did not err.[3]

---

[3] Shaw also asserts that the District Court erred by dismissing his case under Federal Rule of Civil Procedure 41(b). The hospital moved for dismissal pursuant to Rule 41(b) (based on Shaw's failure to cooperate in discovery), or in the alternative, for summary judgment. The District Court acknowledged those alternative bases, but it did not dismiss the action pursuant to Rule 41(b); it instead granted the motion for summary judgment on Shaw's EMTALA claims.

Congress enacted EMTALA to minimize the practice of "patient dumping"[4] among hospitals that voluntarily participate in Medicare or Medicaid programs. See Torretti v. Main Line Hosps., Inc., 580 F.3d 168, 173 (3d Cir. 2009). EMTALA generally requires hospitals to (1) appropriately medically screen people who request emergency room care for emergency medical conditions, and (2) stabilize any emergency medical conditions before discharging or transferring people to other medical facilities. See § 1395dd(a)-(c). EMTALA "was not intended to create a federal malpractice statute or cover cases of hospital negligence." Torretti, 580 F.3d at 173; see also Nartey v. Franciscan Health Hosp., 2 F.4th 1020, 1025 (7th Cir. 2021) (collecting cases). Instead, EMTALA claims generally focus on "disparate patient treatment." See Torretti, 580 F.3d at 174; Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[EMTALA] is intended not to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances," based on the hospital's standard screening procedures).

Shaw asserted that the hospital violated EMTALA's screening provision because its emergency room staff did not provide an x-ray or otherwise detect the fracture in his finger. EMTALA required the hospital to "provide for" Shaw to have "an appropriate

---

[4] Patient dumping is generally defined as a hospital's refusal to treat certain emergency room visitors or transfer of emergency room patients to other institutions without providing appropriate care, often due to lack of insurance. See Torretti, 580 F.3d 168, 173 (3d Cir. 2009).

medical screening examination *within the capability of the hospital's emergency department*, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition . . . exist[ed]." See § 1395dd(a) (emphasis added). Shaw does not dispute that on November 26, 2019, the emergency room's x-ray machine was not working. That is fatal to his EMTALA screening claim. See del Carmen Guadalupe v. Negron Agosto, 299 F.3d 15, 21-22 (1st Cir. 2002) ("A claim of inappropriate medical screening based on a failure to provide certain diagnostic tests must at least address whether the hospital was capable of performing such tests.").

Shaw's stabilization claim is unclear, but he at least asserts that the hospital should have transferred him to a facility that could x-ray his finger. However, EMTALA's screening provision does not require a transfer for screening purposes. To the extent that Shaw presents this as a stabilization claim, it doesn't fit the relevant standard. For Shaw's stabilization claim to survive summary judgment, he needed to show that there was a material factual dispute that (1) he had an emergency medical condition,[5] (2) the hospital actually knew about his condition, and (3) his condition was not stabilized[6] before he was

---

[5] EMTALA defines an emergency medical condition as a medical condition marked by "acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in [1] placing the health of the individual . . . in serious jeopardy, [2] serious impairment to bodily functions, or [3] serious dysfunction of any bodily organ or part." § 1395dd(e)(1).

[6] According to EMTALA, an emergency medical condition is "stabilized" if "no material deterioration of the condition is likely, within reasonable medical probability, to result

transferred or discharged. See Torretti, 580 F.3d at 178. Shaw's stabilization claim fails because he concedes that hospital staff did not detect the fracture, and EMTALA did not require the hospital to stabilize that undetected fracture before discharging him. See Torretti, 580 F.3d at 178 (quoting Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996)) ("[EMTALA] does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware."). The hospital knew that Shaw had a bite wound. There is no dispute that it provided some treatment for the bite wound, and Shaw did not argue that the treatment he received fell short of the treatment that the hospital normally provided to emergency patients with open bite wounds. Because the stabilization claim fails for these reasons, we do not consider Shaw's argument that the District Court erred in determining that he needed a medical expert to prove his stabilization claim.

Accordingly, we will affirm the District Court's judgment.[7]

_____

from or occur during" the individual's transfer or discharge from the hospital. See § 1395dd(e)(3)(B)-(e)(4).

[7] We grant Wayne Memorial Hospital's motion to provide a supplemental appendix.