Maritza Rivera MARRERO,
et al., Plaintiffs,

v.

HOSPITAL HERMANOS MELENDEZ,
INC., et al., Defendants.

No. 01–2717 (DRD).

United States District Court,
D. Puerto Rico.

March 20, 2003.

Jaime F. Agrait–Llado, Agrait & Associates, San Juan, PR, for plaintiff.

Raphael Pena–Ramon, De Corral & De Mier, San Juan, PR, for defendant.

## OPINION & ORDER

DOMINGUEZ, District Judge.

Pending before the Court is Co-defendant's, Hospital Hermanos Melendez, Inc., (hereinafter referred to as "Hospital") Motion for Summary Judgment (Docket No. 17), which Plaintiffs duly opposed (Docket No. 23). Defendant Hospital replied through Docket No. 26. Plaintiffs thereafter sur-replied (Docket No. 31)[1]. After analyzing the submissions and because there are genuine issues as to material facts that persist, *Cortes–Irizarry v. Corporacion Insular*, 111 F.3d 184, 187 (1st Cir.1997), Co-defendant's Motion is **DENIED**.

### THE CASE

The Court must analyze the factual scenario in this case construing the facts, the record, and all reasonable inferences in the light most favorable to the party opposing summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000)("... the Court must draw all rea-

---

**1.** The Court hereby grants Plaintiffs' Motion allowing the filing of a Sur–Reply, with the motion tendered. (Docket No. 31).

sonable inferences in favor of the nonmoving party ..."); *see also, Leahy v. Raytheon Company*, 315 F.3d 11, 17 (1st Cir. 2002) ("... the court must take the record 'in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'") (quoting *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990); see also, *Plumley v. Southern Container Inc.*, 303 F.3d 364, 368–69 (1st Cir.2002)).

The Plaintiffs in this case include Mrs. Maritza Rivera Marrero (hereinafter referred to as "Mrs. Rivera" or "wife"), widow of deceased patient Mr. Jose A. Marrero (hereinafter referred to as "patient" or "Mr. Marrero"), and patient's siblings, (collectively referred to as the "Plaintiffs"). Plaintiffs sue for damages resulting from the wrongful death of Mr. Marrero. Plaintiffs aver this Court has subject matter jurisdiction pursuant to the provisions of federal statute, Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd; 28 U.S.C. § 1331. Plaintiffs also invoke supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1376, for they claim damages under Article 1802 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 5141, for medical malpractice against the treating physicians at the emergency room, and against the Hospital per se. Plaintiffs allege that patient Marrero's medical condition, i.e., severe headache and chest pain, was not appropriately screened by the nursing and medical personnel of defendant Hospital, and that he was discharged from the emergency room against his will and while still unstable. (See Complaint, Docket No.1).

■ The instant Opinion & Order is limited to the applicability of EMTALA to the present case, and as to whether or not this Court has federal jurisdiction under EMTALA over Plaintiffs' claims against the Hospital pursuant to said statute.[2] (See Docket No. 16, Minutes of Proceedings of Initial Scheduling Conference, where the Court stated that it was to adjudicate the jurisdictional question first, through Fed. R.Civ.P. 56.). Discovery proceedings in this case have been strictly limited to the issue of applicability of EMTALA.

### THE FACTS

The Court focuses those facts necessary to "add texture" to the EMTALA statutory analysis. Of course, the Court accepts as true the Plaintiffs' version of events, that are supported by the record. See Fed.R.Civ.P. 56; *Lopez–Soto v. Hawayek*, 175 F.3d 170, 171 (1st Cir.1999).

According to the Plaintiffs, on the morning of December 25, 2000, patient Marrero, a 63 year old male with a history of diabetes mellitus, arterial hypertension, bronchial asthma and psychiatric conditions, "woke up feeling dizziness, vomiting, had headache, was sweating and looked pale". (Amended Complaint, Docket No. 21, ¶ 2). Marrero's wife immediately took him to the Diagnostic and Treatment Center

---

**2.** Therefore, the Court shall not address Plaintiffs' state malpractice liability claims against the physicians that treated Mr. Marrero at the emergency room, against the Hospital, and against emergency room contractor for the Hospital, Grupo de Empresas de Salud de Puerto Rico, Inc. In any event, for private rights of action, EMTALA limits its scope to participating hospitals. Social Security Act, § 1867(d)(2)(A), as amended, 42 U.S.C.A.

§ 1395dd(d)(2)(A). EMTALA does not provide for a private cause of action against individual physicians nor does it provide a cause of action against physicians' medical corporations. See *Medero Diaz v. Grupo De Empresas De Salud*, 112 F.Supp.2d 222, 225 (D.Puerto Rico 2000); *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1256 (9th Cir.1995); *Gerber v. Northwest Hosp. Ctr., Inc.*, 943 F.Supp. 571, 575–576 (D.Md.1996).

(CDT) of Naranjito[3], from where he was referred to co-defendant Hospital, where he arrived around 10:10 a.m. Once there, an employee of the hospital took patient Marrero to the waiting area in a wheelchair. The patient's wife handed the referral note that was given to her at the CDT to the triage nurse in charge, and requested that her husband be treated immediately because he was very ill. The triage nurse was told that the patient had been referred due to high blood pressure. (See Mrs. Maritza Rivera Marrero's Sworn Statement, Ex. I, Docket No. 23). The nurse in charge delayed about half an hour in taking the patient's vital signs. Some 35 to 45 minutes elapsed while patient waited to be treated; it was not until the patient bent forward in the wheelchair, almost fainting, that he was rushed inside the emergency room. Id.

Only then did the triage nurse evaluate Mr. Marrero's condition. According to the triage sheet in the medical record (Ex. III A, to Docket No. 23), he was categorized pursuant to the Hospital's standards, as a "green condition" or category III patient. The categorization is made by the triage nurse. Access to physicians depends on the categorization, which goes from "red" requiring immediate medical attention, to "blue" regarding patients with an ambulatory medical condition who can wait for their evaluation. A "Green" condition patient is characterized in Hospital's regulations as having an illness or injury which requires medical attention and his/her condition is stable; this patient will have a complete estimate and will be evaluated by a physician. (Ex. III, to Docket No. 17). This type of patient should be evaluated by a physician promptly as having an urgent condition. (Ex. II, to Docket No. 17).

Around an hour and a half after the patient was evaluated by the triage nurse, he was finally examined by an emergency room physician, Dr. Norma S. Lopez, at approximately 12:25 p.m. According to Mrs. Rivera's sworn statement, her husband did complain to Dr. Lopez of pain in his head and chest (Ex. I to Docket No. 23). He was ordered to be given Tylenol for the headache; Dr. Lopez did not order any other test at that time, as to patient's head and chest pain conditions, i.e., neurological examination, fundoscopic examination. (See Dr. Lopez's deposition, p. 32, Ex. XIII to Docket No. 23, and the patient's medical record at Ex. III A). According to expert Dr. Pedro Rodriguez[4] "it is a standard operating procedure to perform the basic inexpensive neurological examination, including fundoscopic examination as part of the medical screening of all patients who arrive to emergency rooms with headache, nausea, vomits, weakness, since the differential diagnosis to be considered always is cerebral edema."[5]

After further time elapsed, Dr. Lopez then ordered two diagnosis tests, i.e., electrocardiogram (EKG) and CBC laboratory, to be performed by the nurses at the emergency room. The CBC was taken at around 1:41 p.m. However, as Plaintiffs aver, at least one of these medical orders,

---

3. "Upon arrival, the personnel at the Naranjito CDT told the patient and his wife that his blood pressure was very high." Amended Complaint, ¶ 3.

4. Referring to Plaintiffs' expert witness report, Dr. Pedro J. Rodriguez, cardiologist, cardiovascular consultant. (Ex. II A, ps. 2–5, Docket No. 23).

5. Ex. II A to Docket No. 23. "Cerebral edema could be considered life threatening condition and it is considered an emergency medical condition under EMTALA purposes." Id.,

EKG, was not made.[6] Dr. Lopez ordered another CBC to be performed at around 6:00 p.m. However, there is further no evidence on record showing that the CBC was performed, and there are no results from the test on the patient's medical record. Dr. Lopez admitted that the results from that second CBC are not contained in the record; information then confirmed by nurse Brenda Rios. (Dr. Lopez' deposition, Ex. VI, ps. 42–43, 55, Docket No. 23) (Ms. Rios' deposition, Ex. V, Docket No. 23). According to Mrs. Rivera, no other tests were performed, the patient "was never plugged to any machine". (See Mrs. Rivera's Sworn Statement, Ex. I, to Docket No. 23). The patient was thereafter left unattended for approximately five (5) hours.

At 7:00 p.m., that same day, emergency physician, Dr. Juan A. Maldonado Saravia, examined the patient. Dr. Maldonado told the patient that some lab results had to be repeated, i.e., CBC, then he left. He attended the patient for less than a minute and did not conduct any physical examination of him. (See Mrs. Rivera's Sworn Statement, Ex. I, to Docket No. 23). By 10:00 p.m., the patient's headache seemed to become unbearable and he started to complain of much stronger headaches. He tied a rag of cloth to his head to try to control the pain. An hour elapsed, and at around 11:00 p.m., Dr. Maldonado came back and told the patient and his wife that he was to be discharged because his CBC lab tests had come back "fine" and because the lab test results reflected that the patient only had some kind of virus. Dr. Maldonado expressed to them that the patient's headache and dizziness were probably due to an "imbalance" problem. (See Mrs. Rivera's Sworn Statement, Id.) How-

ever, the specific CBC lab results that Dr. Maldonado allegedly relied upon to discharge the patient, showing he had some kind of virus, are missing from the medical record, (Dr. Maldonado's deposition, Ex. XIX to Docket No. 23). Indeed, the CBC lab results that do show up on the patient's medical record, are "not compatible" with a viral syndrome. (Dr. Maldonado's deposition, Ex. XIX, p. 21, Docket No. 23).

Dr. Maldonado told the patient that he was going to release him anyway, even after the patient and his wife pleaded to him not to order the discharge, because he was feeling very ill due to the headache. (Mrs. Rivera's Sworn Statement, *supra*). According to Mrs. Rivera's Sworn Statement on record, Dr. Maldonado became irritated and replied to her: "Lady, are you a moron? Don't you understand? I am the doctor and I say when the patient should leave." (Ex. I, Docket No. 23). Mrs. Rivera then went to the bathroom, upset and crying, and when she came back, she did not find her husband at the emergency room. Mr. Marrero was swiftly taken away from the emergency room, and discharged from the hospital near midnight, though still having a strong headache and heart pressure at 150/90. Id. Mr. Marrero passed away a few days later. The autopsy performed revealed that he died of a cerebral edema, due to a cerebrovascular accident and arterial hypertension, conditions associated to the diabetes mellitus condition that he suffered. (Ex. XXII, Docket No. 23).[7]

Plaintiffs filed this action on December 21, 2001, then filed an Amended Complaint (Docket No. 21). Plaintiffs' alleged causes of action under EMTALA, against the Hospital, are summarized as follows: 1) Breach of Duty to provide Appropriate

---

**6.** Refer to Analysis of Law, *infra.*

**7.** Autopsy Protocol, performed by Anatomy and Forensic Pathologist, Dra. Yocasta Brugal, dated January 2, 2001.

Screening, and, 2) Breach of Duty to Stabilize before discharge. Co-defendant, Hospital Hermanos Melendez, Inc., filed a Motion for Summary Judgment, stating that the patient was properly evaluated at the emergency room, and then discharged with no emergency medical condition. Hospital Hermanos Melendez basically denies the material allegations of the complaint, therefore contesting this Court's federal question jurisdiction over Plaintiffs' claims. Co-defendant Hospital Hermanos Melendez also alleges that Plaintiffs, patient's wife and siblings, are not entitled to sue under EMTALA, since only the patient is authorized in law to pursue such a claim and be awarded damages prescribed in 42 U.S.C. § 1395dd(d)(2)(A).

### SUMMARY JUDGMENT STANDARD

The standard for summary judgment has been revisited by the First Circuit Court of Appeals on several occasions. *Serapion v. Martinez*, 119 F.3d 982, 986 (1st Cir.1997) (citing *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995), collecting cases). A court may grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c).

To determine whether these criteria have been met, a court must pierce the boilerplate of the pleadings and carefully review the parties' submissions to ascertain whether they reveal a trial worthy issue as to any material fact. *Perez v. Volvo Car Corporation*, 247 F.3d 303, 310 (1st Cir.2001); *Grant's Dairy–Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 14 (1st Cir.2000); *Cortes–Irizarry v. Corporacion Insular*, 111 F.3d at 187. In applying this screen,

the court must construe the record and all reasonable inferences from it in favor of the nonmovant (i.e., the party opposing the summary judgment motion, in this particular case, Plaintiffs). *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 150–151, 120 S.Ct. 2097; *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000); *Plumley v. Southern Container Inc., supra; Leahy v. Raytheon Company, supra*, at 16–17. An absence of evidence on a critical issue weighs against the party—be it the movant or the nonmovant—who would bear the burden of proof on that issue at trial. *Perez, supra; see also, Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35–36 (1st Cir.1998); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990).

A fact is deemed "material" if the same "potentially affect[s] the suit's determination." *Id.* "An issue concerning such a fact is 'genuine' if a reasonable fact finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Cortes–Irizarry, supra.*

Defendant, of course, must not only show that there is "no genuine issue of material facts," but also, that he is "entitled to judgment as a matter of law." *Vega–Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 178 (1st Cir.1997). Further, the court is required to examine the record "drawing all reasonable inferences helpful to the party resisting summary judgment," *Cortes–Irizarry, supra*, at 187. There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose his own ideas of probability and likelihood...." *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987); *Reeves, supra.* Issues of motive and intent are particularly within

the realm of a jury's responsibility, and hence disfavoring the granting of summary judgment. *See: Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1982); *Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982).

Both the Supreme Court and the First Circuit have provided clear and concise precedent regarding summary judgment and those issues which serve to preclude such a finding in the District Court. Among these preclusive issues are motive, intent, **credibility, and any weighing of evidence** to rule upon the pending motion for summary judgment. As a result, the Supreme Court and the First Circuit have limited the extent to which the District Court may consider certain evidence at summary judgment.

The Supreme Court announced in *Poller v. C.B.S.*:

> [S]ummary procedures should be used sparingly in complex [cases] where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. *It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'*

*Poller v. C.B.S.,* 368 U.S. at 473, 82 S.Ct. at 491 *(emphasis added).*

The Supreme Court has been equally clear regarding the court's role in weighing evidence at summary judgment level. The Supreme Court ruled, "[I]t is clear enough from our recent cases that *at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter* but to determine whether there is a genuine issue at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) *(emphasis added).*

The First Circuit has utilized and built on this by stating:

> [T]he nonmoving party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in [the evidence] resolved favorably to him ...' The precincts patrolled by Rule 56 admit of *no room for credibility determinations, no room for the measured weighing of conflicting evidence* such as the trial process entails, *no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the carapace of the cold record.*

*Greenburg v. Puerto Rico Maritime Shipping,* 835 F.2d at 936 (1st Cir.1987) *(emphasis added) quoting Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979).

More succinctly, the First Circuit has frequently reiterated that, *"[t]he court, however, must 'not consider the credibility of the witnesses, resolve the conflicts in testimony, or evaluate the weight of the evidence.'"* *Brennan v. GTE Gov. Systems Corp.,* 150 F.3d 21, 26 (1st Cir. 1998) *(emphasis added) quoting Andrade v. Jamestown Housing Authority,* 82 F.3d 1179, 1186 (1st Cir.1996) *see also Wagenmann v. Adams,* 829 F.2d 196, 200 (1st Cir.1987) ("**We may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence. Rather we must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the nonmovant.**") *(em-*

*phasis added* ). Even more simply expressed, *"[n]o credibility assessment may be resolved in favor of the party seeking summary judgment."* Woodman *v. Haemonetics, Corp.,* 51 F.3d 1087, 1091 (1st Cir.1995) (*emphasis added* ).

"[E]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Ayala–Gerena v. Bristol Myers–Squibb Co.,* 95 F.3d 86, 95 (1st Cir.1996). Furthermore, "credibility determinations, the weight of the evidence, and the drawing of legitimate inferences form the facts are jury functions, not those of the judge." *Reeves,* 530 U.S. at 151, 120 S.Ct. at 2110, *quoting Anderson v. Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505. The facts must be examined under the above criteria because on a potential appeal the appellate court examines "the undisputed facts in the light most congenial to the appellants and adopts their version of any contested facts which are material to our consideration of the issues." *Vega–Rodriguez, supra,* at 178.

### *HOSPITAL HERMANOS MELENDEZ'S CLAIMS FOR SUMMARY JUDGMENT*

#### *ANALYSIS*

The Court now examines the applicable statutory provisions, "taking the record in the light most hospitable" to Plaintiffs, and "indulging all reasonable inferences in [their] favor". *Griggs–Ryan,* 904 F.2d at 115.

#### *EMTALA*

The Court of Appeals for the First Circuit interpreted the EMTALA, for the first time, in the case of *Correa v. Hospital San Francisco,* 69 F.3d 1184 (1st Cir. 1995). The Court recalled the statute's congressional history; "[a]s health-care costs spiralled upward and third-party payments assumed increased importance, Congress became concerned "about the increasing number of reports that hospital emergency rooms are refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance". H.R.Rep. No. 241(I), 99th Cong., 1st Sess. 27 (1986), reprinted in 1986 U.S.C.C.A.N. 42, 605. Congress enacted EMTALA to allay this concern." *Id.,* at 1189.

The EMTALA was enacted in 1986 in response to a distinct and narrow problem—namely, the national concern that uninsured, underinsured, and indigent patients were being "dumped" onto other hospitals, and/or dumped and/or discharged by hospitals who did not want to treat them. See *Summers v. Baptist Medical Center Arkadelphia,* 91 F.3d 1132, 1136 (8th Cir.1996); *Correa,* 69 F.3d at 1189; *Baber v. Hosp. Corp. of America,* 977 F.2d 872, 880 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1039 (D.C.Cir.1991). The Act was intended to create a wholly new cause of action to address this narrow health problem, separate and distinct from traditional state medical malpractice claims. See *Summers,* 91 F.3d at 1137 (citing *Gatewood,* 933 F.2d at 1041). As such, Section 1395dd(d)(2)(A) grants a personal right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section."

On the other hand, numerous courts have noted explicitly that the EMTALA is not to be treated like a federal malpractice statute. See *Marshall v. East Carroll Parish Hosp.,* 134 F.3d 319, 322 (5th Cir. 1998); *Summers,* 91 F.3d at 1137; *Vickers v. Nash Gen. Hosp.,* 78 F.3d 139, 142 (4th

Cir.1996); *Correa,* 69 F.3d at 1192–93.[8]

■ At the outset, the Court initially examines Co-defendant's assertion that Plaintiffs, who are not the patient, lack authority to pursue an EMTALA claim against the Hospital. Section 1395dd(d)(2) states: "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action **obtain those damages available for personal injury under the law of the State in which the hospital is located** ...". (Emphasis added).

Co-defendant's Hospital argument is that the words "individual" and "direct", contained in the statute denote that only the patient may claim under EMTALA. This argument was rejected by the First Circuit Court in *Correa,* 69 F.3d at 1196–1197. This Court explains. As to Co-defendant's contention, this Court follows the First Circuit proposed construction of the statute, as [i]t is equally open to read the law as permitting an individual who has a special relationship with another—say, a wife deprived of consortium or, as here, a bereaved relative—**to sue when she is harmed in direct consequence of an EMTALA violation inflicted upon such other.** *Id.* "EMTALA looks to state law, broadly defined to include Puerto Rico law, anent the availability of damages." *Id.* "When death results, this reading would naturally extend the statutory prerogative to individuals who are eligible to bring survivor's actions under local law." *Id.*

■ Puerto Rico law provides that the heirs of a person who died through another's negligence have claims both for **their own suffering** and the **suffering of the** decedent. *Widow of Delgado v. Boston Ins. Co.,* 101 P.R. Dec. 598, 599–560, 1973 WL 35626 (1973). (Emphasis added). "[T]he right to a claim is not extinguished by death, but passes to the heirs of the injured party." *Alvarez–Pumarejo v. Municipality,* 972 F.Supp. 86, 87 (D.Puerto Rico 1997); *Widow of Delgado, supra.* Mr. Marrero's siblings are thus entitled, as his heirs, to sue. Mr. Marrero passed away, had no children, and no ascendents. Since he left no will, his siblings ("brothers or sisters") are entitled to inherit. See Article 903 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 2671. Under the referred First Circuit plausible construction of the statute, this Court is moved to extend the statutory prerogative to such persons eligible to bring the patient's action, under local law.

Regarding Mr. Marrero's wife, the Court is of the criteria that she is equally eligible to sue, based on her own suffering. Again, as construed, the statute looks to state law, anent the availability of damages. Local law allows a cause of action to immediate family relatives of an individual, who suffered as a result of another's failure to conform to a duty. *Santini Rivera v. Serv Air Inc.,* 137 P.R. Dec. 1, 10, 1994 WL 909527 (1994); *Hernandez v. Fournier,* 80 P.R.Dec. 93, 1957 WL 13027 (1957). "In numerous occasions, we have recognized that a person has a legal right to be compensated for his/her personal suffering, mental anguish, that he/she may have experimented as a result of the damages caused to his/her relatives. We also recognized the right that an individual has to be compensated whenever his/her spouse or relatives suffer harm." *Santini Rivera,* 137 P.R. Dec. at 10. (Translation ours).

8. See also, *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1258 (9th Cir.1995); *Repp v. Anadarko Municipal Hosp.,* 43 F.3d 519, 522 (10th Cir.1994); *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994); *Baber,* 977 F.2d at 879–80; *Gatewood,* 933 F.2d at 1041.

Interpreting the statute as providing damages to "any individual" who suffers personal harm, this Court is moved to make available those damages that flow from breach thereof, of a duty imposed by law, thereafter flowing "under the law of the state". As such, a deceased patient's wife cannot be deprived from bringing forth such action, by limiting the statute's construction of the word "individual" to include exclusively the patient.

 Co-defendant contends that a Congress Judiciary Committee addressed this issue and acknowledged the patient as the only claimant entitled to a cause of action under the provisions of EMTALA. However, "[c]ourts interpret statutes primarily through detailed analysis of concrete statutory language, not by reference to abstract notions of generalized legislative intent." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). Legislative purpose can shed light upon congressional intent where Congress has blown an uncertain trumpet, but it cannot serve as the baseline for statutory construction. "It is a common occurrence in the law that black-and-white principles have an associated set of grey areas. Such is the case with the plain language rule. Though a solid anchor of statutory construction, it is not without exceptions, even in the absence of explicitly contrary legislative history. We have recognized that a 'provision's plain meaning must govern its application, unless a palpably unreasonable outcome would result', . . ." *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981, 986 (1st Cir.1995) (emphasis added); see also *Sullivan v. CIA*, 992 F.2d 1249, 1252 (1st Cir.1993) ("Courts will only look behind statutory language in the rare case where a literal reading must be shunned because it would produce an absurd outcome, . . . or when the legislature has oth-

erwise blown an uncertain trumpet.") (citations omitted). *U.S. v. Rivera*, 131 F.3d 222, 227 (1st Cir.1997).

Other sister Courts have authorized close family members to sue under EMTA-LA. See *Griffith v. Mount Carmel Med. Ctr.*, 842 F.Supp. 1359, 1365 (D.Kan.1994)(affirming award of damages to wife and children of a decedent), as quoted in *Correa*, 69 F.3d at 1196; *del Carmen Guadalupe v. Negron Agosto*, 299 F.3d 15 (1st Cir.2002)(wife and survivors brought EMTALA suit against HIMA Hospital); *Alvarez–Pumarejo, supra*, (patient's family and wife sued Hospital); *Feighery v. York Hospital*, 59 F.Supp.2d 96 (D.Maine 1999) (widow of deceased emergency room patient brought action under EMTALA). Since the language of the statute is clear allowing "any individual" that suffers "direct" harm to sue "under the law of the state", this Court follows *Correa*, 69 F.3d at 1196–1197, as reading the statute "as permitting an individual who has a special relationship with another—say, a **wife deprived of consortium** or, as here, a bereaved relative—**to sue when she is harmed in direct consequence of an EMTALA violation inflicted upon such other.**" (Emphasis added). As this Court stated in *Alvarez–Pumarejo*, 972 F.Supp. at 88, following *Correa's* interpretation, "the First Circuit confirmed that Puerto Rico law permits close relatives to bring EMTALA suits."

The Court now proceeds to analyze the Hospital's items considered worthy of summary judgment disposition.

### DUTY TO SCREEN

In the medical context, EMTALA requires a participating hospital (defined as a hospital that has entered into Medicaid provider agreements under section 1395cc of Title 42), that has an emergency department, to provide an **"appropriate medical screening"** to any individual who presents

himself or herself to the emergency room and requests an examination or treatment for a medical condition. See 42 U.S.C.A. § 1395dd(a), (e)(2); 42 U.S.C.A. § 1395cc; *Mayda Lopez–Soto v. Hawayek,* 175 F.3d at 172. Section 1395dd(d)(2)(A) grants a personal right of action to "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section." In describing the private cause of action, the Court of Appeals for the First Circuit stated that, [t]o establish an EMTALA violation, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department ... (2) the patient has arrived at the facility seeking treatment; and (3) the hospital ... (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition ... *Correa v. Hosp. San Francisco,* 69 F.3d at 1190 (citing *Miller v. Medical Center of S.W. Louisiana,* 22 F.3d 626, 628 (5th Cir.1994); *Stevison by Collins v. Enid Health Sys., Inc.,* 920 F.2d 710, 712 (10th Cir.1990)).

■ The Act does not require a covered hospital to provide a uniform minimum level of care to each patient seeking emergency care and does not provide a private cause of action against a treating hospital for misdiagnosis or improper medical treatment, areas traditionally covered by state malpractice law. See *Marshall,* 134 F.3d at 322; *Summers,* 91 F.3d at 1137; *Vickers,* 78 F.3d at 142; *Holcomb,* 30 F.3d at 117; *Baber,* 977 F.2d at 880.[9] The Court of Appeals for the First Circuit has stated that "[t]he essence of the requirement is that there be some screening procedure, and that it be administered evenhandedly." *Correa,* 69 F.3d at 1192.

The First Circuit Court defined "appropriate medical screening" and specifically stated, "[a] hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination **reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients** and provides the level of screening uniformly to all those who present substantially similar complaints.... [Thus] a refusal to follow regular screening procedures in a particular instance contravenes the statute,** but faulty screenings in a particular case, as opposed to disparate screening or refusing to screen at all, does not contravene the statute." *Correa,* 69 F.3d at 1192–93.

■ "[A] hospital fulfills the 'appropriate medical · screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures. By the same token, **any departure from standard screening procedure constitutes inappropriate screening in violation of the Emergency Act.**" *Feighery v. York Hospital,* 59 F.Supp.2d 96, 104 (D.Maine 1999); *Repp,* 43 F.3d at 523. (Emphasis added). Furthermore, the statute by its terms directs a participating hospital to provide an appropriate screening to all who come to its emergency room. Hence, in order to prove a violation of EMTALA's screening provisions, a plaintiff need not prove that [he] she actually suffered from an emergency medical condition when [he] she first came through the portals of the defendant's facility; the failure appropriately to screen, by itself, is sufficient to ground liability as long as the other elements of the cause of action are met. *Correa,* 69 F.3d at 1190.

9. *Gatewood,* 933 F.2d at 1041; (citing Barry R. Furrow, An Overview and Analysis of the Impact of the Emergency Medical Treatment and Active Labor Act, 16 J. Legal Med. 325 (Sept.1995)); *Tank v. Chronister,* 941 F.Supp. 969, 972 (D.Kan.1996)

■ The first and second prongs to establish an EMTALA violation to its duty to screen are not contested. Plaintiffs in the instant case do contend that, if any screening was provided to the patient, it was not at all appropriate under the terms and standards of EMTALA. By such standards, EMTALA is "designed to assure that any person visiting a covered hospital's emergency room is screened and is stabilized for an emergency medical condition and is stabilized if such condition exists." *del Carmen Guadalupe v. Negron Agosto,* 299 F.3d 15, 19 (1st Cir.2002). From its terms, EMTALA does not define the term "appropriate medical [screening] examination". "[I]t does indicate that the purpose of the screening is to identify an 'emergency medical condition'." *del Carmen,* 299 F.3d at 19. An emergency medical condition is further defined as:

[A] medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—

(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.].

42 U.S.C. § 1395dd(e)(1)(A).

■ "[H]ospitals are expected to employ **'ancillary services routinely available to the emergency department'** in order to identify such conditions." *del Carmen,* 299 F.3d at 19. (Emphasis added). There "is both a substantive and a procedural component to an appropriate medical screening under EMTALA: '[a] hospital fulfills its statutory duty to screen patients in its emergency room if it pro-vides **for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients** and provides that level of screening uniformly to all those who present substantially similar complaints'." *Id.* (Emphasis added); see also, *Jackson v. East Bay Hosp.,* 246 F.3d 1248, 1256 (9th Cir.2001) ("We hold that a hospital satisfies EMTALA's 'appropriate medical screening' requirement if it provides a patient with an examination comparable to the one offered to other patients presenting similar symptoms, **unless the examination is so cursory that it is not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'** " (quoting *Eberhardt v. City of Los Angeles,* 62 F.3d 1253, 1257 (9th Cir.1995))). (Emphasis added).

■ Co-defendant Hospital insists that it gave Mr. Marrero the same screening it provides to all patients, and that the patient did not show any emergency medical condition when he arrived at the hospital. According to EMTALA, a plaintiff does not have to prove the existence of an emergency medical condition; "EMTALA requires participating hospitals to provide appropriate screening to all who enter the hospital's emergency departments, whether or not they are in the throes of a medical emergency when they arrive." *Correa,* 69 F.3d at 1192. Co-defendant Hospital further states that it indeed provided an appropriate medical screening accord its regulations and accord the patient's medical symptoms and condition. Plaintiffs, on the other hand, contest and allege that patient's severe headache, vomiting, dizziness, chest pain (acute symptoms), and high blood pressure, required some level of screening that was not at all provided at the emergency room.

As to those specific averments, the Court finds genuine issues of fact. The Court explains.

It is undisputed from the record that Mr. Marrero showed up at the emergency room, at around 10:10 a.m., on December 25, 2000, and both him and his wife expressed to the triage nurse in charge that he had symptoms, such as vomiting, dizziness, weakness and high blood pressure. Plaintiffs aver that the emergency room personnel's examination of Mr. Marrero was not reasonably calculated to identify the patient's critical condition. Mrs. Rivera's Sworn Statement in record corroborates the fact that, even though the personnel at the emergency room was informed as to Mr. Marrero's medical condition and history (i.e., severe headache, diabetes mellitus, arterial hypertension), the patient's medical record is devoid of some of that information. The triage nurse wrote on the evaluation sheet that the patient was diabetic (Ex. III A, Docket No. 23), but then made an annotation on the patient's medical record that he was not a diabetic. The nurse did not include the CDT's referral note on the record, nor the referral that contained the high pressure reading. (Exs. I and III A, Docket No. 23). Nowhere on the record notes taken by the nurse there is evidence regarding patient's complains of head ache and chest pain, when in fact she was told about the patient's symptoms, i.e., dizziness, vomits, headache, chest pain.

Plaintiffs further question that the full screening and physician's evaluation required for a "Green" condition patient was performed. Although a "Green" condition patient is defined as being stable, a deposition exists in the record wherein Dr. Maldonado states that the patient was not stable when he arrived at the emergency room. (Ex. IV, Docket No. 23). Pursuant to the Hospital's procedures, a patient is categorized by the triage nurse in charge, and depending on the patient's condition, the patient has speedier access to physicians. However, the triage nurse that attended Mr. Marrero, contradicts herself as to how such "category" procedure is implemented. (See Ms. Elba Santiago's deposition, Ex. XI, Docket No. 23). Even though this type of patient ("Green category") should be evaluated by a physician promptly, as having an urgent condition (Ex. II, Docket No. 23), almost two hours elapsed before the patient was examined by an emergency room doctor.

The nurse in charge at the emergency room delayed about half an hour in taking the patient's vital signs; some 35 to 45 minutes later elapsed while patient waited to be treated. As previously mentioned, it was not until the patient bent forward in the wheelchair, almost fainting, that he was rushed inside the emergency room. Then, after an almost two hour delay, Dr. Lopez, physician at the emergency room, ordered Tylenol to be given to the patient for the headache; but no other tests were performed at that time, as to patient's head and chest pain conditions, i.e., neurological examination, nor a fundoscopic examination. (See Dr. Lopez's deposition, p. 32, Ex. XIII to Docket No. 23, and the patient's medical record at Ex. III A). After Dr. Lopez's evaluation, the patient was left unattended for a period of approximately five (5) hours, until at around 7:00 p.m., when Dr. Maldonado attended him for less than a minute, without conducting any physical examination.

Even though at some point Dr. Lopez ordered an electrocardiogram (EKG) and CBC laboratory, to be performed by the nurses at the emergency room, the patient's medical record prima facie shows that the EKG medical order was not instrumented. A certified copy of the pa-

tient's medical record was provided by the Hospital, which lacks an EKG test reading performed on the patient. (Ex. III A, Docket No. 23). Another copy of the record was provided, after commencement of this action, wherein an added sheet is included as an EKG reading, but with no date, no time, and no name for the patient. Id.

The record shows that only one CBC lab test was performed. Dr. Lopez allegedly ordered a second CBC to be performed at around 6:00 p.m. However, again there is no evidence on record showing that it was performed, and there are no results from that test on the patient's medical record. Dr. Lopez further admitted that the results from that second CBC are not contained on the record; information then confirmed by nurse Brenda Rios. (Dr. Lopez' deposition, Ex. VI, ps. 42–43, 55, Docket No. 23) (Ms. Rios' deposition, Ex. V, Docket No. 23). According to Mrs. Rivera, no other tests were performed, the patient "was never plugged to any machine". (See Mrs. Rivera's Sworn Statement, Ex. I, to Docket No. 23).

■ As to those facts, the Court must point out that an egregious and unjustified delay in attending a patient can amount to an effective denial of a screening examination. *Correa,* 69 F.3d at 1193. A complete failure to attend a patient who presents a condition that practically everyone knows may indicate an immediate and acute threat to life (i.e., severe head and chest pain, with a high blood pressure) can constitute a denial of an appropriate medical screening examination under section 1395dd(a). *Id.* Depending on the particular circumstances of a case, and construing the record in the light most favorable to plaintiff as the Court must perform in summary judgment stage, the Court can find that no screening at all was provided to the patient. Screening per se in the instant case is contested. The Court harbors doubt as to whether the examination provided to patient Marrero was "so cursory that it [was] not 'designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury'." *Eberhardt v. City of Los Angeles, supra,* at 1257.

Co-defendant Hospital argues that screening of Mr. Marrero's was reasonably calculated to identify the critical medical conditions afflicting him. Nonetheless the Court, after reviewing all documents presented and making all reasonable inferences in favor of Plaintiffs, is dubious as to whether Mr. Marrero's medical condition was at all screened. "A patient [like Mr. Marrero] who communicates that [he] she feels nauseous or dizzy could be describing a symptom of an emergency medical condition." *Reynolds v. MaineGeneral Health,* 218 F.3d 78, 81–82 (1st Cir.2000); *Correa,* 69 F.3d at 1192 ("[N]ausea and dizziness ... might well herald the onset of an emergency medical condition in the case of a hypertensive diabetic."). "In such a case the condition manifests itself by the dizziness or nausea, a symptom that is then communicated verbally by the patient. Information about risk-factors, such as injuries or medical history, would inform a physician's interpretation of that symptom. Nausea and dizziness alone do not necessarily indicate that an emergency medical condition exists but, when coupled with a history of hypertension and diabetes, ... may indicate the presence of an emergency medical condition". *Id.* The presence of such emergency medical condition will trigger the appropriate screening requirement, and given the circumstances, "[a] refusal to follow regular screening procedures" could contravene the statute. *Baber v. Hospital Corp. of Am.,* 977 F.2d at 879.

There is no doubt that in the instant case, Mr. Marrero and his wife communicated all these symptoms to the medical staff, i.e., severe head ache, chest pain and high blood pressure. The Hospital contends that Mr. Marrero had no emergency medical condition when he arrived at the emergency room. The Hospital further avers that the fact that some tests were performed satisfies the screening provision and that the essence of such requirement is that there is some screening provided. The Court reminds parties that "the provision of some testing or treatment to a patient [does not] *a priori* satisfies a hospital's statutory obligation to appropriately screen." *Torres Otero v. Hospital General Menonita*, 115 F.Supp.2d 253, 259 (D.Puerto Rico 2000); *Romo v. Union Memorial Hosp., Inc.*, 878 F.Supp. 837, 842 (W.D.N.C.1995) ("even if Defendant attended to and treated [patient] him with a variety, or in his words 'a battery', of tests and evaluations, it may still fall short of an 'appropriate medical screening'.").

The Court must infer that Dr. Lopez's examination at the emergency room left out basic procedures that must be followed to adequately screen a patient like Mr. Marrero. Dr. Lopez stated in her deposition that she merely ordered Tylenol for the patient's head ache. There is evidence on record showing that although having severe headache, dizziness, vomits, Dr. Lopez failed to submit the patient to timely further examinations, i.e, neurological evaluations, to screen his medical condition. Furthermore, there is an expert witness report in file from cardiologist, Dr. Pedro J. Rodriguez, expressing that "[i]t is a standard operating procedure to perform the basis inexpensive neurological examination, including fundoscopic examination as part of the medical screening of all patients that arrive to emergency room with headache, nausea, vomits, and weak-

ness, since the differential diagnosis to be considered always is cerebral edema." (Ex. II, Docket No. 23, p. 6). In his supplementary report, Dr. Rodriguez further states that "the patient never received even a basic neurological examination, ... [which] represent[s] the direct cause for not identifying an emergent neurological condition in the patient ...". (Ex. XXI, Docket No. 23).

The Court finds that in the instant case, it is precisely a question of fact whether, in reality, the tests and evaluations appropriate to treat Mr. Marrero's head and chest pain conditions, were performed. The Court may not ignore, at summary judgment stage, that there is sufficient evidence on record showing that the only test actually performed was a first CBC lab test. Proof that a second CBC allegedly ordered was performed is lacking, or at least highly controverted. The Hospital insists that second CBC was performed, when in fact the evidence on record, examined in Plaintiffs' favor, shows it was not. There are at least two depositions on record stating that the results from a second CBC are not contained on the record, and that no other tests were performed; the patient "was never plugged to any machine".

Further, it is highly disputed that the EKG was performed. There is no certified proof of its reading; except for a copy of a reading that has no name for patient, no date and no time. Nurse, Ms. Brenda Rios, does not even recall ever performing, or "if she did the EKG to the patient"; in her deposition, she admitted that the name of the patient, date and time of the EKG should usually be in the result sheet. (Ex. V, Docket No. 23). Nonetheless, the Hospital brings forth no evidence on the contrary. Since the mere "existence" of such test is questioned, the Court must conclude at summary judgment (the Court

may not weigh the evidence), that the Hospital failed to provide that specific diagnostic test.

Whether Co-defendant Hospital provided an appropriate screening to Mr. Marrero, given the circumstances of the present case, is a question of fact that must be left to the jury to address. Whether those tests were actually performed goes directly to the question of appropriateness of screening provided. Stating that such test or that an EKG were performed, would require the Court to afford more credibility to the Hospital's contentions, weigh evidence in its favor, and to assess credibility determinations not permitted at summary judgment level. "Credibility choices are generally for the jury, not for the court[s] ...". *Correa*, 69 F.3d at 1192; *Cook v. Rhode Island Dep't of Mental Health, Retardation, and Hosps.*, 10 F.3d 17, 21 (1st Cir.1993).

■ The Court recognizes that there is a "fine line between improper treatment and inadequate medical screening examination. While improper treatment is not covered by EMTALA, inadequate screening is." *Fuentes Ortiz v. Mennonite General Hospital*, 106 F.Supp.2d 327, 331 (D.Puerto Rico 2000). From the evidence presented and the further discrepancies as to the tests allegedly performed to Mr. Marrero, the Court cannot conclude, at this summary judgment stage of proceedings, that Co-defendant Hospital actually provided an adequate screening examination. *Id.*

As stated above, such a determination would be based on weighing of the evidence provided, and would require the Court to issue credibility conclusions and pronouncements, either favoring or not favoring each party's evidence. That finding is to be made, not under summary judgment standards, but by the jury. *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 677 (1st Cir.1996); *Tew v. Chase Manhattan Bank, N.A.*, 728 F.Supp. 1551, 1555 (S.D.Fla.1990). Because the instant request depends on the weighing of the evidence, (see *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d at 936; and at summary judgment level, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence ...."), summary judgment is inappropriate. The Court further explains.

"At summary judgment stage, the trial judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is genuine issue for trial". *Anderson v. Liberty Lobby*, 477 U.S. at 242–243, 106 S.Ct. 2505; *Brennan v. GTE Gov't Systems Corp.*, 150 F.3d at 25, ("[t]he court,[at summary judgment] ... 'must not consider the credibility of witnesses, resolve the conflicts in testimony, **or evaluate the weight of evidence.**", quoting *Andrade v. Jamestown Housing Authority*, 82 F.3d at 1186 (Emphasis added); *Wagenmann v. Adams*, 829 F.2d at 200). Whether or not there was an appropriate screening in this case, and whether Mr. Marrero was provided an "adequate first response to [his] medical crisis", *Reynolds*, 218 F.3d at 83, is a question of weighing of the evidence which is exclusively for the jury. Though the Co-defendant Hospital makes strong points here [10], which may very well eventually persuade the jury, the Court must **DENY** the request at summary judgment standard.

10. To wit, that faulty screening is not covered under EMTALA, and that EMTALA is not a malpractice law.

In this particular case, where the Court lacks evidence to state whether Mr. Marrero was screened accord his medical condition, ascertaining whether Co-defendant Hospital deviated from its screening practice, is by its very nature a question of fact and not of law. It is thus left exclusively to the jury as a question of "sufficiency of the evidence". There is a genuine issue of material fact as to whether the procedures followed in Co-defendant's emergency room, were reasonably calculated to identify the patient's critical medical condition. *del Carmen,* 299 F.3d at 21. Whether the Hospital in fact knew that Mr. Marrero presented an emergency condition, and if in fact the personnel followed the appropriate screening within the Hospital's capability, is, in this case, for the fact finder to determine, *Malave Sastre v. Hospital Doctor's Center, Inc.,* 93 F.Supp.2d 105 (D.Puerto Rico 2000). Ascertaining when and what someone might have known of a particular fact is also by its very nature a question of fact and not of law. Any and all weighing of the evidence is the jury's exclusive determination, and becomes no man's land for the Court to enter on summary judgment standard, to be left exclusively to the jury as a question of "knowledge", *Tew v.Chase Manhattan Bank, N.A.,* 728 F.Supp. at 1555.

Since it is disputed that Co-defendant's screening was not reasonably calculated to Mr. Marrero's medical condition, summary judgment for the Hospital on the substantive component, i.e., duty to screen, of EMTALA, is inappropriate. *del Carmen,* 299 F.3d at 22.

### DUTY TO STABILIZE

Subsection (b) of 42 U.S.C. § 1395dd, rather than imposing the Hospital's duty to triage and screen, focuses on the Hospital's statutory duty to stabilize. Thus, if "any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition," the hospital must try to stabilize that condition, and can shift the patient to another institution only in accordance with EMTALA's transfer provisions. 42 U.S.C. § 1395dd(b). *Lopez–Soto v. Hawayek,* 175 F.3d at 173. Within such terms, the hospital must provide either, (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or; (B) for transfer of the individual to another medical facility in accordance with subsection (c). 42 U.S.C. § 1395dd(b).

■ "Once the hospital makes the determination that the patient is suffering from an emergency condition, the hospital must provide reasonable treatment to stabilize the patient's emergency situation before discharging or transferring him or her". See 42 U.S.C. § 1395dd(e)(3)(A). EMTALA defines the duty to stabilize as the duty "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility ...". Id. As with screening, "in determining whether a patient has been stabilized, **the fact-finder must consider whether the medical treatment and subsequent release were reasonable[,] in view of the circumstances that existed at the time the hospital discharged** or transferred the individual." *Torres Otero v. Hospital General Menonita,* 115 F.Supp.2d at 259 (Emphasis added); quoting *Delaney v. Cade,* 986 F.2d 387, 393 (10th Cir.1993). "Liability under EMTALA does not hinge on the result of the plaintiff's condition after the release, but rather on whether the hospital would have considered another patient in the

same condition as too unstable to warrant his or her release or transfer". *Id.*, at 260.

■■■ The duty to appropriately screen is independent from the duty to stabilize. The duty to stabilize is defined in the statute itself, and speaks of the requirement that a hospital provide treatment to assure that "no material deterioration of the condition is likely to result from or occur during the transfer [or discharge]." 42 U.S.C. § 1395dd(e)(3)(A). In other words, "the duty to stabilize exists not in a vacuum, but rather in reference to a transfer of the patient from the hospital". *Torres Otero*, 115 F.Supp.2d at 260. **A hospital violates its duty to stabilize under EMTALA when it fails to stabilize a patient before transferring or discharging him or her.** See *Correa*, 69 F.3d at 1190.[11] (Emphasis added).

■■■ "[O]nly if th[e] screening uncovers an emergency medical condition must the hospital stabilize the patient and refrain from transferring him except in compliance with the statutory commands, see 42 U.S.C. § 1395dd(b)-(c)." *Lopez–Soto v. Hawayek*, 175 F.3d at 172. If no emergency condition is detected, there is no duty to stabilize. However, given the factual scenario present in the instant case, the Court views the facts in the light most favorable to Plaintiffs and therefore assumes that the patient was suffering from an emergency condition while at the emergency room. The Hospital therefore had to stabilize Mr. Marrero before sending him home. A hospital's duty is "to provide such medical treatment of the condition as may be necessary to assure, within a reasonable medical probability, that no mate-

rial deterioration of the condition is likely to result from or occur." 42 U.S.C. § 1395dd(e)(3)(A). "The duty to stabilize is therefore greater than the duty to screen". See *Matter of Baby K*, 16 F.3d 590, 595–96 (4th Cir.1994), cert. denied, 513 U.S. 825, 115 S.Ct. 91, 130 L.Ed.2d 42 (1994); as quoted in *Fuentes Ortiz*, 106 F.Supp.2d at 332–333.

■■■ Here, the Court harbors doubt as to whether Co-defendant acted as if Mr. Marrero had an emergency condition. There are genuine issues of fact as to whether the Hospital stabilized Mr. Marrero prior to discharging him. Regarding that, the Court merely needs to address Plaintiffs' version of facts, further supported by the medical record, depositions and sworn statements on file, to conclude that Co-defendant's assertions that it stabilized the patient are contradicted. The Hospital's regulations define "stabilization" as the treatment necessary to ensure, within a reasonable medical probability, that no deterioration of the patient's condition will result from the transfer or discharge. (Ex. XXV, Docket No. 23). The Hospital's regulations further mandate that the nurses will be in charge of complying with medical orders, writing down on the file compliance, and signing name and title. (Ex. XII, Id.).

Co-defendant Hospital Hermanos Melendez contends that it complied with its duty to stabilize, in that it made sure that the patient's medical condition had been treated before discharging him. The Hospital further avers that both physicians at the emergency room concluded that Mr. Marrero had viral syndrome, causing the

---

11. There is no duty to stabilize unless the hospital "has actual knowledge of the individual's unstabilized emergency medical condition" *Summers*, 91 F.3d at 1140; *Vickers v. Nash. Gen. Hosp*, 78 F.3d 139, 145 (4th Cir. 1996) ("[t]he Act does not hold hospitals accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware."). However, Co-defendant's Hospital factual theory is that they knew the condition treated, and stabilized the patient.

nausea and vomiting, and that there was no doubt that Dr. Maldonado knew and understood that the patient was stable when he discharged him home. However, the factual scenario in this case, and even Dr. Maldnonado's deposition on record contradict such allegation. The Court explains.

As may be recalled from the facts, Dr. Lopez ordered two diagnosis tests, i.e., electrocardiogram (EKG) and CBC laboratory, to be performed by the nurses at the emergency room. The first CBC was taken at around 1:41 p.m. Dr. Lopez ordered another CBC to be performed at around 6:00 p.m. There is no evidence on record showing that it was ever performed, and there are no results from that test on the patient's medical record. Dr. Lopez and the nurse Brenda Rios further admitted that the results from that second CBC are not contained in the medical record.

When initially seeing the patient at 7:00 p.m., Dr. Maldonado told the patient that some lab results had to be repeated. After that first initial, less than one minute evaluation, at around 11:00 p.m., Dr. Maldonado came back, did not examine the patient, failed to review the record, and advised the patient and his wife that he was to be discharged because his CBC lab tests had come back "fine". That, because the lab test results reflected that the patient only had some kind of virus. However, the specific CBC lab results that Dr. Maldonado allegedly relied upon to discharge the patient, showing he had some type of virus, are missing in the medical record, (Dr. Maldonado's deposition, Ex. XIX to Docket No. 23). Dr. Maldonado's deposition reveals that the CBC lab result at the patient's medical record [12], is "not compatible" with a viral syndrome. *Id.* Dr. Maldonado's notes only indicate that he discharged the patient based on those

(second) lab results, but subsequently he admitted, at this deposition, that a patient cannot be discharged based on laboratory results alone. Hence, Dr. Maldonado's discharge notes state that those labs were compatible with a viral syndrome, and then admitted that the only lab results that do show up on the patient's medical record are not compatible with any virus. *Id.*, p. 21. Therefore, there is no stabilization of the patient, examining the record in the light most congenial to the Plaintiffs.

Furthermore, Dr. Maldonado stated that, according to the usual practice at the hospital, when a patient complains of not feeling well enough, a previously ordered discharge, will be omitted, and the physician will consult another doctor regarding patient's critical condition. (Dr. Maldonado's deposition, Ex. XIX, Docket No. 23). Here, Dr. Maldonado advised the patient that he was going to release him anyway, even after the patient and his wife pleaded to him not to order the discharge, because he was feeling very ill due to the headache. (Mrs. Rivera's Sworn Statement, *supra*). Mrs. Rivera's stated that Dr. Maldonado became irritated and replied to her: "Lady, are you a moron? Don't you understand? I am the doctor and I say when the patient should leave." (Ex. I, Docket No. 23). The Hospital denies those allegations, because its personnel would never intend to act like that, and further Dr. Maldonado admitted that if Mrs. Rivera would have told him that he was not feeling well, he would have cancelled the discharge in order to consult another physician. On this point, however, the Court would be required to weigh issues of fact in its ultimate determination, which of course is not permitted at this particular stage of proceedings. *Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835

12. The one taken at 1:41 p.m.

F.2d at 936 (at summary judgment level, there is "no room for **credibility determinations,** no room for the measured weighing of conflicting evidence ..."). (Emphasis added).

Once again, without entering into an opinion one way or the other as to credibility, properly assessing this argument involves weighing of facts which the Court is banned from performing at this stage. Issues of motive and intent are, of course, strictly left to the jury. *Poller, supra; Pullman–Standard, supra; see also Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d at 677, (reversing summary judgment and stating, "determinations of motive and intent, ..., are questions better suited for the jury".). Further as to this argument, and because Dr. Maldonado's statement that he discharged a patient based on a test result that is unknown, and not contained on the medical record, Co-defendant's argument that it stabilize the patient before discharge is **DENIED,** because there are material facts in controversy. *Kennedy v. Josephthal Co. Inc.,* 814 F.2d 798, 804 (1st Cir.1987).[13]

### CONCLUSION

By the very nature of parties contested facts, to be weighed in determining whether the patient's medical condition was appropriately screened and whether his emergency medical condition was stabilized, the Court would need to rely upon self-weighing of evidence. Co-defendant's allegations regarding Mr. Marrero's condition and its screening, were controverted by the Plaintiffs' recounting of events and expert medical analysis. *Alvarez–Pumarejo,* 972 F.Supp. at 88. Genuine issues as to material facts include the physical and medical condition of Mr. Marrero, whether it was appropriately screened, and whether treatment at the Hospital stabilized the patient's condition. As stated various times herein throughout this opinion, the factual scenario of the instant case is inappropriate for brevis disposition. *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d at 936 (at summary judgment level, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence ...").

The Court cannot grant Co-defendant's Summary Judgment as requested, because as a federal judge (as opposed to civil, local judges, who do not have to maneuver through the jury institution), the Court is barred from weighing any evidence or make credibility assessments. The Court, at the present stage of proceedings, must analyze the summary judgment, taking the facts in light most favorable to Plaintiffs, and as explained above, is precluded from issuing summary judgment. See *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. at 150–151, 120 S.Ct. at 2110–2111.

Wherefore, Co-defendant's, Hospital Hermanos Melendez, Inc., Motion for Summary Judgment (Docket No. 17), is **DENIED.**

**IT IS SO ORDERED.**

---

**13.** The Court further notes that the ultimate decision is one of "knowledge" by a party derived from circumstantial evidence, which is a matter to be determined by the jury unless there is "smoking gun" evidence as to said particular knowledge. *Tew v. Chase Manhattan Bank, N.A.,* 728 F.Supp. at 1555.